JUDGE PRESKA

# UNITED STATES DISTRICT COURT

__SOUTHERN__ District of __NEW YORK__

Susan Denison,

            Plaintiff,

- against -

United Airlines, Inc. Long Term Disability
Income Plan and Life Insurance Company
of North America,

           Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER: 08 CIV 7435

TO: (name and address of defendants)

United Airlines, Inc. Long Term Disability Income Plan
1200 E. Algonquin Road
Elk Grove Township, Illinois 60007

Life Insurance Company of North America
1601 Chestnut Street, TL 09 A
Philadelphia, PA 19101

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY, (name and address)

        **DeHAAN BUSSE LLP**
        **300 Rabro Drive**
        **Suite 101**
        **Hauppauge, New York 11788**

an answer to the complaint which is herewith served upon you, within __20__ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON
CLERK

(BY) DEPUTY CLERK

AUG 22 2008
DATE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SUSAN DENISON,

                 Plaintiff,

– against –

UNITED AIRLINES, INC. LONG TERM DISABILITY
INCOME PLAN and LIFE INSURANCE COMPANY
OF NORTH AMERICA,

                 Defendants.
------------------------------------------------------------X

**08 CIV 7435**

Civil Action No.:

COMPLAINT

JUDGE PRESKA

AUG 22 2008
U.S.D.C. S.D.N.Y.
CASHIERS

    Plaintiff, Susan Denison, by her attorneys, DEHAAN BUSSE LLP, for her Complaint against the Defendants, United Airlines, Inc. Long Term Disability Income Plan (the "LTD Plan") and Life Insurance Company of North America ("LINA"), hereby alleges as follows:

### JURISDICTION AND VENUE

    1.     Jurisdiction of the Court is based upon 29 U.S.C. §§ 1132(e)(1) and 1132(f), which give the District Courts jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan. In addition, this action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the District Court jurisdiction over actions that arise under the laws of the United States.

    2.     Under the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§ 1001, et seq.) ("ERISA"), the long-term disability plan at issue in this litigation must contain provisions for administrative or internal appeal of denial of benefits. Plaintiff has exhausted all administrative avenues of appeal and has received a final denial. Therefore, this matter is properly before this court for de novo judicial review under Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989).

    3.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) which allows an action under Title I of ERISA, as amended, to be brought in the district where the plan is administered, where the breach took place or where a defendant resides or may be found.

## NATURE OF ACTION

4. This is a claim seeking a declaration that Plaintiff is entitled to disability income benefits pursuant to the terms and conditions of an employee benefit welfare plan.

5. The LTD Plan provides long term disability benefits to employees of United Air Lines, Inc. ("United"). As such, the LTD Plan is an employee benefit welfare plan established and maintained by an employer or employee organization for the benefit of its employees, and ERISA applies to this action. Said benefits were effective at all times relevant hereto.

6. Claims for benefits are administered and paid through a Long Term Disability Policy, No. LK-5945, issued by Defendant, LINA. LINA has made all of the claims decisions in this matter.

## STANDARD OF REVIEW

7. The LTD Plan in force at the time Plaintiff became disabled does not contain a grant of discretion to LINA or the Plan Administrator.

8. As such, this Court must conduct a *de novo* review of the denial of Plaintiff's claim under Firestone Tire & Rubber Co. v. Bruch.

## THE PARTIES

9. Plaintiff was born in September 1946, is presently 61 years old, and is a resident of New York, New York.

10. Defendant, the LTD Plan, is an employee benefit welfare plan, as defined by ERISA. Upon information and belief, United is the named Plan Administrator and agent for service of legal process, with a home office located at 1200 E. Algonquin Road, Elk Grove Township, Illinois 60007. United's registered agent for service of process in New York State is: The Prentice Hall Corporation System, Inc., 80 State Street, Albany, New York 12207.

11. Defendant, LINA, is an incorporated insurance company licensed to conduct the business of insurance in New York. Upon information and belief, LINA is the named Claims Administrator. LINA's address is 1601 Chestnut Street, TL 09 A, Philadelphia, Pennsylvania 19101.

## STATEMENT OF FACTS

Plaintiff's Occupation:

12. Plaintiff became an employee of United in August 1966. Plaintiff continued working for United through August 10, 2001, on which date she became disabled. As such, she was a covered participant in the LTD Plan.

13. Prior to and including August 10, 2001, Plaintiff was employed by United as a Flight Attendant. In this capacity, Plaintiff was responsible for performing and assisting in the performance of all *en route* cabin services to passengers or ground cabin service to delayed or cancelled passengers; providing passengers with appropriate safety information; insuring compliance with government and company regulations; providing leadership, direction and assistance to passengers during emergencies, including evacuation; assisting passengers with baggage and garments; assisting ill or incapacitated passengers; answering passenger inquiries; dealing with disorderly passengers and unusual incidents; serving food and beverages; lifting from the floor to above shoulder level cabin equipment items and passenger belongings; pushing or pulling cabin equipment such as movable carts; operating emergency door handles; reading and demonstrating service and emergency instructions; communicating information to passengers and crew orally; operating mechanical and safety equipment; and performing mathematical computations involving cash sales receipt accounting, time zone changes, *etc*.

14. Plaintiff's pre-disability income was about $40,874.40 per year.

15. For the period beginning prior to August 10, 2001, and at all relevant times hereto, Plaintiff, together with other regular employees of United, was covered as a participant under the LTD Plan.

The Terms of the LTD Plan:

16. The LTD Plan provides benefits to its participants through a Group Long Term Disability Income Policy (the "Group Policy") issued and administered by LINA.

17. LINA, as the insurer of the LTD Plan, pays LTD benefits out of its own coffers. In this position, LINA could significantly reduce its operating expenses, and increase its profits, simply

Page 3 of 15

by denying claims. This would have a direct dollar-for-dollar effect. As such, LINA is operating under a significant conflict of interest which had a material effect on its decision-making on this claim.

18.   The Group Policy provides for payment of monthly benefits to eligible employees and is designed to protect employees against a loss of earned income during periods of extended disability. Immediately prior to the onset of her disability, Plaintiff was over 18-years of age and had already completed twelve (12) continuous months of service with United.

19.   Plaintiff's benefit equals 50% of her Monthly Basic Earnings reduced by "Other Benefits," which includes benefits received pursuant to the Social Security Act.

20.   In Plaintiff's case, the Group Policy provides for a benefit of approximately $1,703.10 per month, less the amount of "Other Benefits," as defined by the Group Policy.

21.   Long Term Disability benefits are to commence after a "Benefit Waiting Period" of 270 days.

22.   In the instant matter, Plaintiff's Long Term Disability benefits commenced on May 8, 2002, the expiration of the Benefit Waiting Period, and were erroneously terminated by LINA on May 7, 2004.

23.   According to the September 1, 1991, Amendment to the Group Policy, since Plaintiff's disability commenced prior to the age of 60, she is entitled LTD benefits until she is no longer disabled; or until she ceases to be under the care of a physician.

24.   The LTD Plan defines "Total Disability" as follows:

*Total Disability. An Employee will be considered Totally Disabled if because of Injury or Sickness, he is unable to perform all the essential duties of his occupation.*

*After Monthly Benefits have been payable for 24 months, an Employee will be considered Totally Disabled only if, because of Injury or Sickness, he is unable to perform all the essential duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience.*

25.   The LTD Plan also requires a claimant to provide proof of Disability and that she is under the regular attendance of a physician.

26.   The LTD Plan gives LINA the right to examine Plaintiff. The LTD Plan states:

*PHYSICAL EXAMINATION. The Insurance Company, at its own expense, will have the right to examine any person for whom claim is pending as often as it may reasonably require.*

27. The LTD Plan requires Plaintiff to apply for "Other Benefits," which includes benefits received pursuant to the Social Security Act.

28. Moreover, if Plaintiff does not apply for any "Other Benefit" (*e.g.* Social Security Disability benefits), LINA can penalize Plaintiff by assuming the receipt of the Other Benefit and estimating the amount of the "Other Benefit." The LTD Plan states:

***Assumed Receipt of Benefits***

*If an Employee is covered under the Federal Social Security, Workers' Compensation, or similar laws, he will be assumed to be receiving such benefits for himself (and for his dependents, if applicable). These assumed benefits will be in the amount the Insurance Company estimates he (and his dependent, if applicable) is eligible to receive. This assumption will not be made if the Employee gives the Insurance Company proof that:*
*(1)   he has applied for these benefits; and*
*(2)   payments were denied.*

Plaintiff's Disability:

29. Plaintiff was forced to stop working on August 10, 2001, due to Depression, Panic Disorder, Bilateral Foot Deformities, Pain and Weakness in both feet, and Bilateral Hand Pain and Weakness.

30. Plaintiff was diagnosed with the above medical conditions by her various treating physicians.

31. In a letter dated September 16, 2004, Plaintiff's treating Psychiatrist stated that based on Ms. Denison's Depression and Panic Disorder, she is "too anxious and depressed to function even in a low-stress work place."

32. In a Psychiatric/Psychological Impairment Questionnaire dated February 3, 2005, the treating Psychiatrist diagnosed Ms. Denison with a Panic Disorder, Depression and Alcoholism with a Global Assessment of Functioning ("GAF") score of 45, which signifies, "Serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." The treating Psychiatrist noted that Plaintiff suffers from poor memory, appetite disturbance with change, sleep disturbance,

mood disturbance, recurrent panic attacks, anhedonia or pervasive loss of interests, social withdrawal or isolation, decreased energy, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts and generalized persistent anxiety.

33. In the same Impairment Questionnaire, the treating Psychiatrist noted that Ms. Denison was hospitalized on four (4) occasions as a result of her symptoms, and she has marked limitations (*i.e.*, effectively precludes the individual from performing the activity in a meaningful manner) in her abilities to remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently.

34. The treating Psychiatrist also noted moderate limitations (*i.e.*, significantly affects but does not totally preclude the individual's ability to perform the activity) in Plaintiff's abilities to understand and remember one or two step instructions; carry out simple one or two step instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; make simple work related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel to unfamiliar places or use public transportation.

35. In a letter to Allsup, Inc., Plaintiff's treating Social Worker stated the following:

*From my two years and eight months experience of working closely with Susan my assessment is that she does not have the mental, emotional, nor physical capacity to hold down a basic non-skilled job because the patient's ability to understand and remember detailed instructions is markedly limited and her ability to understand and remember very short and simple instructions is moderately limited. Ms. Denison exhibits difficulty in carrying out detailed instructions, maintaining attention and concentration even during our 50-minute sessions. She exhibits signs of anxiety and*

*confusion. I do not believe that the patient would be able to adapt to required changes in any work settling. Her attention to maintain concentration for extended periods is very limited; she is easily flustered and nervous.*

36. In a Psychiatric/Psychological Impairment Questionnaire dated February 15, 2005, the treating Social Worker diagnosed Ms. Denison with a Panic Disorder, Depression and Alcoholism with GAF score of 45. The treating Social Worker noted that Plaintiff suffers from poor memory, appetite disturbance with change, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interest, time or place of disorientation, social withdrawal or isolation, decreased energy, obsessions or compulsions, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts and generalized persistent anxiety.

37. In the same Impairment Questionnaire, the treating Social Worker noted marked limitations (*i.e.*, effectively precludes the individual from performing the activity in a meaningful manner) in Plaintiff's abilities to remember locations and work-like procedures; understand and remember one- or two-step instructions; understand and remember detailed instructions; carry out simple one or two-step instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; make simple work related decisions; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently.

38. The treating Social Worker also noted moderate restrictions (*i.e.*, significantly affects but does not totally preclude the individual's ability to perform the activity) in Ms. Denison's abilities to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; sustain ordinary routine without supervision; interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take

appropriate precautions; and travel to unfamiliar places or use public transportation. The treating Social Worker also stated that Ms. Denison is incapable of even low stress.

39. Plaintiff was hospitalized on two occasions in October and November 2006, following suicide attempts.

40. Also, as a result of her depression and alcoholism, Ms. Denison was admitted to the Westchester Division of New York-Presbyterian Hospital for a two week period from November 7, 2006, through November 21, 2006, for additional treatment for her Depression and Alcoholism.

41. Following the November 7, 2007, hospitalization, Plaintiff was admitted to the Addiction Institute of St. Luke's Roosevelt Hospital Center on an outpatient basis from November 22, 2006, through March 2007, for further treatment of her Depression and Alcoholism.

42. With regard to her physical impairments, in a report dated April 25, 2005, Plaintiff's treating Orthopedist stated that "[d]ue to the patient's foot problems which would cause an inability to stand for prolonged periods of time and the fact that the problem may reoccur with prolonged sitting, she would be considered disabled from an orthopedic standpoint."

43. In or about February 15, 2002, Plaintiff underwent a surgical procedure for treatment of a hammer toe deformity on the right foot – second, third and forth toes.

44. In a letter dated March 2, 2006, Plaintiff's treating Rheumatologist stated that Ms. Denison presented with severe weakness and pain in both feet, and hands. The treating Rheumatologist stated that Plaintiff's arthritis has been getting progressively worse and an X-ray revealed severe arthritis.

45. Ms. Denison also treats with a Hand Specialist for her right thumb arthritis, tenosynovitis of the right middle finger and left middle finger and a tumor on the left wrist, for which she had surgery in December 2004. As a result of these impairments, Ms. Denison underwent an arthroplasty of the right thumb on or about October 17, 2002.

46. On September 30, 2004, Plaintiff underwent an exploration of the basal joint arthroplasty, neurolysis of the radial sensory nerve, release of the first dorsal extensor compartment, tendon transfer of slip of abductor pollicis longus from the thumb to the index. The post-operative diagnosis was instability of the thumb metacarpal and postoperative basal joint arthroplasty.

47. Plaintiff has received, and continues to receive, appropriate medical treatment for her various medical conditions from her treating physicians.

### PLAINTIFF'S FIRST CAUSE OF ACTION FOR LONG-TERM DISABILITY BENEFITS

48. With regard to Plaintiff's claims for benefits under the LTD Plan, she continued to work through August 10, 2001.

49. On August 10, 2001, Plaintiff was forced to stop working due to Depression, Panic Disorder, Bilateral Foot Deformities, Pain and Weakness in both feet, and Bilateral Hand Pain and Weakness.

50. In compliance with the terms and conditions of the LTD Plan, Plaintiff timely applied for long-term disability insurance benefits.

51. By letter dated July 19, 2002, LINA notified Plaintiff that it was approving her claim for LTD benefits with benefits beginning on May 8, 2002 – following the 270-day Benefit Waiting Period.

52. Plaintiff received LTD benefits from May 8, 2002, through May 7, 2004.

53. By letter dated June 11, 2004, LINA notified Plaintiff that it was terminating her claim for LTD benefits effective May 7, 2004, following the shift in the definition of disability from "own occupation" to "any occupation." LINA erroneously concluded that Plaintiff was capable of working in any occupation.

54. Although the Group Policy explicitly gives LINA the right to have Plaintiff examined by a physician of its choice, the carrier chose not to exercise this right.

55. This adverse determination was based, in part, on the opinion of LINA's own in-house Behavioral Health CM (presumably "Case Manager") that the limitations given by Ms. Denison's treating Psychiatrist and treating Social Worker do not indicate "functional deficits to a severity that would preclude EE from RTW to any occupation."

56. LINA's Behavioral Health case manager is not a physician and therefore never examined Plaintiff and as such, her report is medically inferior and scientifically unreliable as

compared to the opinions of the claimant's treating doctors. Moreover, the Behavioral Health case manager has a pecuniary interest in finding Plaintiff able to work.

57. This termination of Ms. Denison's LTD benefits was also based, in part, on a Transferrable Skills Analysis ("TSA") that failed to take into account Plaintiff's psychiatric impairments. The TSA erroneously indicated that Plaintiff could return to work as a Referral Clerk, Temp Agency; an Order Clerk, Food/Bev.; and/or a Telemarketer.

58. Via letter dated December 28, 2004, Plaintiff, through counsel, requested a copy of her entire claim file; advised the carrier that Plaintiff would be submitting additional medical documentation; and requested that LINA refrain from any further consideration of Plaintiff's claim pending such a submission.

59. Via letter dated March 22, 2005, LINA agreed to a 30-day extension of time within which Ms. Denison could appeal and submit additional medical documentation in support of her LTD appeal.

60. By letter dated April 27, 2005, Plaintiff, through counsel, formally appealed LINA's June 11, 2004, termination of Plaintiff's LTD benefits by submitting comments and additional medical documentation in support of Plaintiff's claim.

61. By letter dated May 12, 2005, Plaintiff's counsel submitted further medical documentation in support of Ms. Denison's claim for LTD benefits.

62. By letters dated June 15, 2005, July 14, 2005, and August 12, 2005, LINA notified Plaintiff that it was in the process of obtaining a peer review of Ms. Denison's claim, and therefore, the insurance carrier needed additional time to render a decision.

63. By letter dated September 15, 2005, LINA upheld its decision to terminate Plaintiff's LTD benefits as of May 7, 2004.

64. This adverse determination was based on the opinion of peer review physician Robert Phelps, Jr., M.D., who reviewed Ms. Denison's claim from the orthopedic perspective. In his July 9, 2005, and August 10, 2005, reports, Dr. Phelps concluded that:

> *Claimant appears markedly limited in terms of ability to stand and walk, lift and carry, push and pull, but is able [to] use her hands for light gripping, light holding,*

Page 10 of 15

*light handling and typing. She is apparently unable to handle the mental stresses associated with work.*

*She is restricted from standing or walking more than 2 hours in an 8 hour workday, climbing more than rarely and lifting and carrying 10 pounds or more either occasionally or frequently.*

65.  Dr. Phelps and LINA therefore erroneously determined that Ms. Denison could perform sedentary work.

66.  The September 15, 2005, adverse determination was also based on the opinions of LINA's own in-house physician advisor, Stuart Shipko, M.D., who reviewed Ms. Denison's claim for a psychiatric perspective. In his September 13, 2005, report, Dr. Shipko indicated that in a telephone conversation with him, both Plaintiff's treating Psychiatrist and her treating Social Worker stated that Ms. Denison was totally disabled. Despite this fact, Dr. Shipko concluded that the "Available information is insufficient to support an inability to work at the occupations identified in the Transferrable Skill Analysis from the date of 6/7/04 forward to the present."

67.  Further, as file review consultants, Dr. Phelps and Dr. Shipko never examined Plaintiff and as such, their reports are medically inferior and scientifically unreliable as compared to the opinions of the claimant's treating doctors. Moreover, Drs. Phelps and Shipko have a pecuniary interest in finding Plaintiff not disabled.

68.  For a second time, LINA chose to forego its right to have Plaintiff examined. As a result, the only scientifically and medically acceptable evidence has been provided by Ms. Denison's treating doctors, all of whom found her to be totally disabled.

69.  Plaintiff applied for and was awarded Social Security Disability Benefits by the Social Security Administration ("SSA"). In a Fully Favorable Decision dated April 12, 2005, Administrative Law Judge Newton Greenberg determined that Plaintiff was disabled under the Social Security Act with an onset date of July 15, 2001.

70.  The definition of disability under the Social Security Act is more restrictive than the definition of disability found in the LTD Plan.

71. LINA failed to reconcile the conclusion of the SSA, that Ms. Denison was totally disabled, with its conclusion that she was not totally disabled under a far less stringent definition of disability.

72. In addition, LINA receives a financial benefit from the Social Security Disability award as a result of the policy offset provisions.

73. By letter dated September 26, 2005, Plaintiff, through counsel, requested a copy of Plaintiff's entire claim file, including among other things, clarification of the issues raised with regard to the completeness of Ms. Denison's claim file raised in the April 25, 2005, appeal letter.

74. By letter dated October 13, 2005, LINA provided a copy of Ms. Denison's file, however, the carrier refused to provide the vocational rehabilitation counselor's resume, an organizational chart, its procedures, guidelines, claims manuals and protocols as that information is allegedly considered to be confidential and proprietary information.

75. By letters dated October 19, 2005, and December 12, 2005, Plaintiff's counsel again demanded copies of the vocational counsel's resume, LINA's organizational charts and LINA's procedures, guidelines, claims manuals, and protocols.

76. By letter dated January 18, 2006, LINA advised that it would not provide the additional information requested.

77. By letter dated May 3, 2006, Plaintiff, through counsel, formally appealed LINA's September 15, 2005, termination of Plaintiff's LTD benefits by submitting comments and additional medical documentation in support of Plaintiff's claim. The additional medical documentation consisted of a report from Ms. Denison's treating Social Worker.

78. Despite this submission, via letter dated July 10, 2006, in violation of ERISA and its rules and regulations, LINA advised that "Without the above suggested documentation covering the stated period, we cannot consider another review of your client's claim. As such, we are unable to alter our previous decision and Ms. Denison's claim remains closed."

79. LINA's July 10, 2006, correspondence failed to provide her with a full and fair review of her LTD appeal because upon information and belief, the insurance carrier failed to review the

contents of Ms. Denison's claim file prior to issuing this denial. According to 29 C.F.R. §2560.503-1(h),

> [t]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures
>
> ***
>
> iv) provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

80. By letters dated July 24, 2006, and September 6, 2006, Plaintiff's counsel sought clarification of LINA's apparent July 10, 2006, denial.

81. In response, by letter dated November 17, 2006, LINA advised that Ms. Denison exhausted any rights to further appeals to this office.

82. For a third time, LINA chose to forego its right to have Plaintiff examined. As a result, the only scientifically and medically acceptable evidence has been provided by Ms. Denison's treating doctors, all of whom found her to be totally disabled.

83. Also, for a third time, LINA failed to reconcile the conclusion of the SSA, that Ms. Denison was totally disabled, with its conclusion that she was not totally disabled under a far less stringent definition of disability.

84. In an attempt to avoid litigation, by letter dated December 12, 2007, Plaintiff, through counsel, submitted additional documentation from Ms. Denison's treating health care providers documenting the severity of her psychiatric conditions.

85. Unfortunately, due to the severity of Ms. Denison's psychiatric impairments, Plaintiff's counsel was unable to obtain this information prior to its May 3, 2006, appeal.

86. Via letter dated February 18, 2008, LINA advised that the insurance carrier would not process the December 12, 2007, request as a "voluntary appeal."

87. In seeking to further its own pecuniary interest, LINA has denied Plaintiff of her right to a full and fair review of the denial of her claim, as required by ERISA.

88. LINA, as the insurer of the LTD Plan, pays LTD benefits out of its own coffers. As such, LINA is operating under a significant conflict of interest which had a material effect on its decision-making on this claim.

89. LINA, as the claims administrator for the LTD Plan, is a fiduciary, as defined by ERISA, and owes a fiduciary duty to Plan participants such as Ms. Denison.

90. Fiduciaries have a statutory obligation, in performing their duties, to act prudently and solely in the interest of Plan participants and beneficiaries, and strictly in conformance with the provisions of the Plan.

91. The adverse claim decisions rendered in the instant action have been made by LINA, which has a pecuniary interest in denying claims. This pecuniary interest created a conflict of interest, which had a direct and important effect on LINA's decision making on Ms. Denison's LTD claim.

92. Fiduciaries also have a statutory obligation to fairly interpret and construe the terms of the Plan and thereby make decisions in accordance with plan language.

93. LINA's decisions were not supported by the medical evidence and were not supported by the applicable plan language.

94. LINA's decisions in the instant claim were not supported by the evidence submitted with Plaintiff's claim.

95. Plaintiff was and remains disabled within the terms and conditions of the LTD Plan. Plaintiff is, therefore, entitled to the continued receipt of Long-Term Disability benefits retroactive to May 8, 2004, and continuing to the present under the LTD Plan.

WHEREFORE, Plaintiff respectfully requests the following relief:

a. That the Court declare and then determine that, under the terms of the LTD Plan, Plaintiff's disability began on August 10, 2001, and that she continues, without interruptions, to be disabled within the terms of the LTD Plan;

b. That, after making such a determination, the Court grant Plaintiff appropriate legal

relief and order Defendants, the LTD Plan and LINA, to compensate Plaintiff for her disability in accordance with the terms of the LTD Plan, retroactive to May 8, 2004;

    c.    That the Court award Plaintiff her attorney's fees pursuant to ERISA, 29 U.S.C. §1132(g); and

    d.    That Plaintiff receive such other necessary, proper and equitable relief, including interest, costs and disbursements, as to which she may be entitled.

Dated: August 19, 2008
       Hauppauge, New York

                                      DeHaan Busse LLP

By: *[signature]*
                                      John W. DeHaan (JWD 8863)
                                      300 Rabro Drive
                                      Suite 101
                                      Hauppauge, New York 11788
                                      Telephone: (631) 582-1200
                                      Facsimile: (631) 582-1228